UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
───────────────────────────────────────────x

RONNIT SCHWEBEL,

                Plaintiff,

  -against-                                       17 Civ. 8541 (CM)

KRISTINE R. CRANDALL, Acting Director,
Nebraska Service Center, United States Citizenship
And Immigration Services, and CHAD WOLF,
Acting Secretary, United States Department of
Homeland Security,

                Defendants.

───────────────────────────────────────────x

## ORDER DISPOSING OF MOTION FOR EAJA FEE AWARD

McMahon, J.:

       This is a case that arose out of peculiar facts. There is, therefore, no reason why the motion addressed in this opinion should not rest on peculiar facts.

       The plaintiff in this lawsuit – an individual brought to this country by her parents at the age of eight – prevailed in her effort to obtain citizenship pursuant to the Child Status Protection Act, 8 U.S.C. § 1153(h). She prevailed both in this court and in the Court of Appeals, albeit on different grounds in each court.

       Her attorneys have moved in both courts for a fee award pursuant to the Equal Access to Justice Act ("EAJA"), 28 U.S.C. § 2412(d)(1)(A). Under that statute, an attorney representing a prevailing alien is entitled to collect attorney's fees unless (i) the Government's position in the underlying litigation was "substantially justified" or (ii) special circumstances make an award of fees unjust. 28 U.S.C.A. § 2412(d)(1)(A)

In accordance with well-settled law, the EAJA fee application for fees incurred in connection with the appeal had to be directed to the Court of Appeals. "Applications [under the EAJA] for appellate fees in this Circuit should be filed directly with the Court of Appeals." *Smith v. Bowen*, 867 F.2d 731, 736 (2d Cir. 1989). And, "An application for appellate fees under EAJA should therefore always be presented to the court of appeals" because only the appellate court can determine whether the United States' position was "substantially justified" on appeal. 28 U.S.C. § 2412(d)(1)(A). *McCarthy v. Bowen*, 824 F.2d 182, 183 (2d Cir. 1987) (*per curiam*).

That said, the *McCarthy* court indicated that, "There may be situations where the court of appeals will find it helpful to enlist the aid of the district court in resolving disputed issues concerning an application for appellate fees," but directed that the application for appellate fees "should always be filed with the court of appeals so that the appellate court may determine whether district court assistance is required." *Id.*

In this case, as in *McCarthy,* the plaintiff properly presented her fee application to the Court of Appeals, and this court stood down in deference to the Circuit. However, the Second Circuit has remanded the fee request to me. And while the mandate says that "the district court [should] consider the application for attorney's fees," I must assume, in light of *McCarthy* – on which the remanding panel relied – that I am limited to considering whether an EAJA fee award was appropriate "in connection with proceedings in the district court." *Id.*

This places me in a somewhat uncomfortable position. Per *McCarthy*, the point of this remand is to help the Court of Appeals "resolv[e] disputed issues concerning an application for appellate fees." But in the unusual circumstances of this case, I greatly doubt that my views about what went on in the district court would help the Court of Appeals decide whether the Government's position on appeal was "substantially justified." For while the Court of Appeals

affirmed the judgment of this court, it did so on a ground that this court specifically declined to reach. And to complicate matters further, the reviewing panel declined to reach the issue decided by this court and "express[ed] no view on" the correctness of this court's reasoning.

I conclude that what is required of me is to decide the only issue I am permitted to decide under Second Circuit law – whether the Government's position in the district court was "substantially justified" – and to determine the amount of the fee award at the district court level if it was not. It may be that some findings I make in connection with that application will be of assistance to the Court of Appeals when it considers the portion of the fee application that only it can decide.

**An EAJA Fee Award for Proceedings in the District Court is Appropriate Because The Government's Position in the District Court Was Not "Substantially Justified" And No Special Circumstances Exist That Would Make A Fee Award Unjust**

The Government makes no argument that this is a case in which special circumstances exist that would make a fee award unjust. Its only argument against a fee award is its contention, maintained until the end, that its litigation position before this court was "substantially justified."

A litigation position is "substantially justified" when it is "justified in substance or the main – that is, to a degree that could satisfy a reasonable person." *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). If "reasonable people could differ as to the appropriateness of the contested actin," then a litigation position is "substantially justified." *Id.* at 564, see also *Comm'r, I.N.S. v. Jean*, 496 U.S. 154, 158 n.6 (1990) (a position is "substantially justified" when it has a "reasonable basis both in law and fact").

It is the Government's burden to establish that its litigation position was "substantially justified." Moreover, as the Second Circuit held in *Healey v. Leavitt*, 485 F. 3d 63, 67 (2d Cir. 2007), in deciding whether the Government's position was substantially justified a court may look

both to "the position taken by the United States in the civil action[][and] the action or failure to act by the agency upon which the civil action is based." (Citing 28 U.S.C. § 2412(d)(2)(D); *Jean*, 496 U.S. 154; *Sotelo-Aquije v. Slattery*, 62 F.3d 54, 57 (2d Cir.1995).) It is, therefore, well-established that "the Government's prelitigation conduct . . . could be sufficiently unreasonable by itself to render the entire Government position not 'substantially justified,'" *United States v. $19,047.00 in U.S. Currency*, 95 F.3d 248, 252 (2d Cir.1996); *see also Env't Def. Fund v. Watt*, 722 F.2d 1081, 1086 (2d Cir. 1983) ("The government may lack substantial justification for its position even though it does not insist upon an unreasonable stance through to the resolution of a case.").

In its original decision, this court concluded that the Government's position was "unreasonable," in that it both ran counter to the statutory language and contradicted long-standing positions taken by the government in its own interpretive documents. *Schwebel v. Crandall*, 343 F. Supp. 3d 322, 330 (S.D.N.Y 2018). A position that is found by a court to be "unreasonable" would seem by definition not to have a "reasonable basis in both law and fact." The argument that the Government's position before this court was "substantially justified" flies in the face of this court's findings.

In reaching its conclusion, the court relied heavily on pre-litigation facts – specifically, the fact that the USCIS Operative Guidance in effect around the period in question provided that a CSPA applicant's age calculation pursuant to 8 U.S.C. §1154(h) was to be determined by the age the alien was "on the date the visa number became available" to the petitioner's parent. The Government concedes that a visa number first became available to petitioner's mother on July 1, 2007, *see id.* at 329 – although, for reasons that are gone into at length in this court's original opinion, the mother was required to make a subsequent application and obtained a visa number for a second time five years later, by which time Ms. Schwebel had turned 21. This court concluded

that the relevant visa number date for purposes of the statute was the 2007 date. The Government points now to statutory guidance issued in November 2020 – long after both this court and the court of appeals ruled against it – which interprets the statute in a manner that gets around this court's decision.[1] Guidance propounded after the Government lost the case in not one but two courts is entirely unpersuasive on the question of whether its arguments were "substantially justified" when they were made.

The Government intimates that, by deciding the appeal on grounds other than those on which this court relied, the Court of Appeals effectively ruled that this court's decision was erroneous – thereby making the Government's position on the issues that were decided by this court "substantially justified." I reject the Government's intimation, which rests on the faulty premise that the Court of Appeals concluded that this court's decision was wrong. It did no such thing. To the contrary: The Court of Appeals stated quite clearly that it was expressing no view the reasoning this court used to conclude that the actions of USCIS in denying Ms. Schwebel's application were arbitrary and capricious. I do not interpret the mandate of the Court of Appeals as either directing or inviting me to reconsider the merits of a decision it left untouched, even as it chose another, less trodden path to achieve the same result, which was citizenship for Ms. Schwebel.

Furthermore, in view of the ultimate ruling of the Court of Appeals, the pre-litigation activity of the Government all but compels a finding that the Government's position in connection with Ms. Schwebel's application cannot be deemed substantially justified.

"One cannot estop the King" is an ancient maxim of Anglo-American law. "The doctrine of estoppel is not available against the government except in the most serious of circumstances."

---

[1] *See* https://www.uscic.gov/sites/default/files/document/policy-manual-updates/20201113-CSPA.pdf.

*Drozd v. INS*, 155 F. 3d 81, 90 (2d Cir. 1988). It is, therefore, hardly surprising that this court chose to rest its decision on other grounds.

But the Court of Appeals concluded that the Government's "affirmative misconduct" in this case was severe enough to warrant application of this much disfavored equitable remedy against the sovereign. Under *Healey*, a finding that the Government's position is not "substantially justified" is thus perfectly appropriate. Certainly, the arguments propounded by the Government in this court on the question of estoppel – arguments this court never reached, but which were identical to those successfully advanced in the Court of Appeals – could not possibly have been "substantially justified" in light of the Circuit's finding against the Government's position. "Affirmative misconduct" is never "substantially justified."

The Government next argues that its position regarding Ms. Schwebel's application was "substantially justified" because the law relating to what the Circuit deemed "misconduct" – namely, the Government's failure to notify the applicant or her attorney of the fact that her application was not being processed – was "unsettled" until the Court of Appeals concluded, in 2020, that such notification had to be made within a reasonable period of time. *Schwebel v. Crandall*, 967 F.3d 96, 105 (2d Cir. 2020).

8 CFR §103.2(a)(7) required the Government to issue a receipt indicating that Schwebel's application was processed; the same regulation, in the form that was in effect in 2007, required the government to "reject[][an application] as improperly filed if it was defective. Per USCIS policy in effect at the relevant time, any manual rejection of Schwebel's application for defectiveness (in this case, the defect was that the application arrived two days early) "would have resulted in the return of the completed application to the applicant with a cover letter explaining the reasons for rejection." *Schwebel*, 967 F.3d at 100. The regulation does not specify a period of time within

which either of these notices must be sent. The Government insists that the Court of Appeals imposed a new judicially-created requirement that the applicant be furnished with "reasonably prompt notice" – a requirement not found anywhere in the regulation. It thus reasons that the Government's arguments were "substantially justified" because USCIS had no idea, back in 2007, that it was required to give notice that was "reasonably prompt."

But the Government did not provide Schwebel with *any* notice of manual rejection within *any* period of time, let alone a reasonable period of time. Schwebel's attorney filed her CPSA application on June 27, 2007; it was delivered two days later. Because it arrived prior to July 1, 2007, the application was rejected, not processed, and no receipt date was ever recorded. Ergo, the Government, having received the application (that much is undisputed), was obligated by its own policy to issue a manual rejection letter explaining the reason for the rejection. *Schwebel*, 967 F.3d at 100; Docket #28 (Gydesen Decl.) ¶¶ 9, 10. It did not do so. Schwebel's lawyer was not told that her application had not been processed until 2010, nearly three years after the application was filed – this despite USCIS having received and acknowledged a timely supplement to the application (the medical report received by USCIS on August 13, 2007), and then receiving (and apparently not responding to) six status inquiries over the next two and one half years. The Government cannot seriously argue that its obligation either to record the receipt date of a processed application, or notify the applicant that the application was not being processed was unsettled in 2007, when its own regulations and policies required as much.

It is true that the Court of Appeals used the phrase "reasonably prompt notice of any such rejection" in its opinion. Because the Government gave Schwebel no notice at all – because it utterly failed to conform to its own procedures – the Government's current focus on the words

"reasonably prompt" is something of a red herring. No notice whatever is and was plainly a dereliction of duty in 2007, and no notice is what happened here.

But to me there is nothing at all novel or surprising about the Circuit's use of these words. In other (and to me, analogous) contexts, it is a settled maxim when the time for doing a legally-required act is not specified, the law will presume that the act must be done within a reasonable period. *See e.g., Seaboard Coast Line R. Co. v. Long Island R. Co.*, 447 F. Supp. 108, 114 (E.D.N.Y. 1978) (citing *City of New York v. N.Y. Central R. Co.,* 9 N.E.2d 931 (N.Y. 1937)). Even if I, a district judge, were in a position to question the Court of Appeals' ruling on this point, I would find nothing new or unsettled about applying this concept to an obligation imposed on the Government by its own regulations. As for what constitutes "reasonably prompt notice:" if one purpose of a manual rejection letter was to give the applicant an opportunity to cure the defect, then it should have gone out before August 17, 2007, the period within which Schwebel could have adjusted her status based on her mother's employment visa. Alternatively, since the Government admits that it destroyed any record of a defective and manually rejected application within four months, *Schwebel*, 967 F. 3d at 100, it would seem to have self-defined what constitutes a "reasonable" period for giving notice of the application's rejection – namely, before it became impossible to give the required notice, due to the destruction of the record. In either event, not giving notice of anything for two and one half years strikes me as *per se* unreasonable.

The Government insists that one must make the "substantially justified" decision by viewing its case "as a whole." Well, between this court and the Court of Appeals, the Government's case has been viewed "as a whole" by four judges. All of the Government's arguments have been considered by one court or the other, and all of them have been rejected. The Government's pre-litigation conduct has been deemed by this court to be arbitrary and capricious

and by the court of appeals to amount to affirmative misconduct justifying the working of an estoppel. I see no basis whatever for concluding that any position taken by the Government in this case was substantially justified.

I thus conclude that the application for attorney's fees incurred in connection with proceedings in the district court should be granted. Per *McCarthy,* I leave it to the Court of Appeals to decide whether there should be an EAJA fee award for fees incurred on the appeal.

**The Fee Application is Supported by Contemporaneous Time Records**

Turning to the amount of the fee request, the Government principally argues that no fees can be awarded because the attorneys failed to keep contemporaneous time records in the manner required by Second Circuit jurisprudence. I reject the Government's argument.

The attorneys in this case kept time records each working day. They kept contemporaneous time records throughout the day using a legal notepad, noting the time a task began and ended along with the nature of the task. At the end of the day, Attorney Feinbloom, the principal attorney who worked on this case, and logged the lion's share of the hours, entered the nature of the work performed and total hours – but not the underlying "time begun/time ended" data – into a Microsoft Word file entitled "CASENAME.hours" (in this case, Schwebel,hours). He received an email from his partner, Ms. Bertisch, who billed a relatively small number of hours to the Schwebel case, and he entered her time and the tasks performed into the "Schwebel.hours" data base.

As was the case with the Government's records of manually rejected CPSA applications, the legal notepad entries were not maintained once the day's work and the total number of hours expended were logged into the data base. Therefore, when the court asked to see those underlying legal pad pages, counsel advised me that they did not exist. (Docket #75.)

Nonetheless, I credit the sworn statement of Mr. Feinbloom that he and his partner kept contemporaneous time records of the work they performed each day in the manner described in his Supplemental Declaration, and that the records provided to the court are the (slightly edited) version of the Schwebel.hours Microsoft Word file that was maintained in the ordinary course of business by the firm. (Docket #71-1.) This court is not aware of any rule in this Circuit requiring attorneys to employ special software to keep track of the time expended on various tasks attendant to a representation. It is certainly becoming a "best practice" to employ such software, and attorneys who expect to make fee applications are well advised to use such software – especially because a number of judges in this Circuit have viewed fee applications unfavorably when counsel did not use timekeeping software. However, there remain luddites among us (myself included), and I will not reject this application on that basis. Instead, I will process the old- fashioned application in the old-fashioned way, by reviewing the time averred to have been expended on the tasks performed for reasonableness.

Insofar as the fees incurred in this court are concerned (which, per *McCarthy*, are the only fees on which I can rule), plaintiff seeks reimbursement for a total of 178.25 hours. The hours expended in the district court can be divided into three parts – the preparation and filing of the Complaint; the preliminary injunction litigation; and the summary judgment litigation.

Plaintiff's counsel seeks reimbursement for approximately 15 hours (1.5 of which were Ms. Bertisch's hours) for the preparation of the complaint in this action. The time expended on this task is reasonable.

The complaint was not filed immediately after it was drafted, but (as Mr. Feinbloom's time records indicate) was sent to the Government informally in the hope of reaching some resolution. Mr. Feinbloom avers that this effort "got nowhere" (Reply Declaration at page 5, ¶ 7(D).) The

preliminary injunction motion was necessitated by the Government's refusal to negotiate a resolution to the case; it was not "unnecessary," as the United States Attorney argues, and there is no reason for this court to believe that the time expended in preparing, filing and litigating that motion could have been avoided. I was not the judge to whom the preliminary injunction motion was presented – my colleague, Judge Furman, was – but it is my understanding that only the prospect of an adverse decision on that motion induced the Government to agree to the *pendente lite* stipulation that Judge Furman signed. The exercise thus cannot be characterized as "a waste of time," as the Government now contends.

By the time the Government agreed to a stipulation, all the work on the preliminary injunction motion had been completed – all 15.5 hours of Mr. Feinbloom's time and 11 hours of Ms. Bertisch's. In this court's experience, 26.5 hours is a very modest amount of time to expend briefing a complicated preliminary injunction motion and arguing that motion at a conference with the court. Mr. Feinbloom avers that he generally spent more time on preparing those briefs than he billed; having worked on more than a few such briefs myself, I believe his statement to be entirely credible.

The remaining time was spent on briefing the motion for summary judgment. As this court decided that motion, I can personally attest to the complexity of the issues presented. The time spent drafting the briefs is anything but excessive; indeed, I commend counsel for plaintiff on what I perceive to be the economy of their presentation and the time spent thereon.

The total number of hours expended on this complex representation strikes this court as extraordinarily low – not inflated at all. Particularly noteworthy is that Mr. Feinbloom's partner, Ms. Bertisch, cannot be taxed with any duplication of effort; the application for her time expended in this court is limited to the modest total of 26 hours, which were spent on tasks appropriate to a

lawyer who was not primarily responsible for the representation, such as legal research, preparing tables of authorities and doing edits on a brief written by Mr. Feinbloom. In each instance she spent a very few hours on these tasks; the miniscule number of hours for which reimbursement is sought establishes that she was not duplicating, but supplementing, the work done by Mr. Feinbloom. Some of these administrative tasks might be more appropriately performed by a paraprofessional, not an attorney; however, given my decision on the "special factor" enhancement, the court is not inclined to reduce the fee award attributable to Ms. Bertisch's hours to take that fact into account, since all of her time will be reimbursed by the Government at a paraprofessional rate (or less).

**The Plaintiff is Not Entitled to a "Special Factor" Enhancement**

The EAJA limits a fee award in a case covered by the statute to $125 an hour, plus a cost of living adjustment – which in this case would top out at about $212/hour, a fee unthinkably low in the New York City metropolitan area – unless a litigant can demonstrate a "a special factor, such as the limited availability of qualified attorneys for the proceedings involved, justifies a higher fee." 28 U.S.C. § 2412(d)(2)(A). In *Pierce v. Underwood*, 487 U.S. 552, 572 (1988), the Supreme Court discussed the circumstances in which a court could conclude that there existed a "limited availability" of qualified attorneys to handle the proceeding:

> We think it refers to attorneys having some distinctive knowledge or specialized skill needful for the litigation in question – as opposed to an extraordinary level of generally lawyerly knowledge and ability useful in litigation. An example of the former would be an identifiable practice specialty, such as patent law, or knowledge of foreign law or language.

In the opinion of this court, immigration law is "an identifiable practice specialty" that could fall easily within the standard announced in *Pierce.* A number of courts have so held,

including the Seventh, Ninth and Eleventh Circuits (see cases cite at pages 5-6 of Plaintiff's Moving Memorandum of Law, Docket # 59.)

However, I reluctantly conclude that the Second Circuit's decision in *Healey*, 485 F.3d 63, compels a finding that plaintiff's attorneys can recover no more than the EAJA statutory fee, without enhancement.

There is little question in my mind that this case was unusually complex and that it involved more than "established principles of immigration law" with which a majority of immigration attorneys are familiar as a matter of course. The Second Circuit intimated as much in its opinion when it referred to the "labyrinthine intricacies of our immigration laws." This case involved an extraordinarily complex set of facts – involving not only the agency's egregious errors at the time the application was filed, but the subsequent fact of the parent's employer going out of business – and it is hardly surprising that several immigration lawyers who were consulted by Ms. Schwebel prior to her retention of Mr. Feingold concluded that they could do nothing to help her. It was certainly not an easy case to win. If the term "limited availability" were defined in a literal manner, it would be difficult to conclude that there was not a "limited availability" of attorneys with the "extraordinary level of knowledge" – and, frankly, the guts – to take on her convoluted case.

But in *Pierce*, the Supreme Court specifically stated that "limited availability" does not mean that attorneys willing to take on a difficult matter are in "short supply." *Pierce*, 487 U.S. at 572. Unfortunately for Ms. Schwebel and her counsel, the facts of this case, with one irrelevant exception,[2] are essentially identical to those in *Healey,* where the Second Circuit – deeming itself constrained by an earlier decision that required narrow construction of the "special circumstances" exception to the EAJA cap, *see Wells v. Bowen*, 855 F. 2d 37, 42 (2d Cir. 1988) – concluded that

---

[2] The specialized field of law at issue in *Healey* was social security law, not immigration law.

a district court abused its discretion in authorizing payment of enhanced fees for the successful completion of a particularly complex case.

The attorneys in this case are, like the attorneys in *Healey*, "undisputably experienced" in the practice of a particular field of law. In fact, they are extraordinarily competent in a field that the Court of Appeals appropriately described as "labyrinthine." But that does not equate to possessing any "*distinctive* knowledge or *specialized* skill *needful* for the litigation in question." *Healey*, 485 F.3d at 69 (emphasis in original) (quoting *Pierce*, 487 U.S. at 572). In *Healey*, the district court was asked to do, and did, precisely what Attorney Feinbloom asks this court to do here: award an enhanced fee because of the difficulty of the issues presented by the case and its procedural complexity. The Second Circuit concluded that that was insufficient where, as in *Healey* and here, the lawyer was engaged in the type of tasks in which lawyers always engage – here, drafting a complaint, litigating a preliminary injunction motion, and making a motion for summary judgment:

> While the scope or complexity of some cases may make these tasks more demanding, even an "extraordinary level" of skill in these routine tasks of litigation does not justify a higher fee award under the EAJA. *Pierce*, 487 U.S. at 572; *see also Dubose v. Pierce*, 857 F.2d 889, 893 (2d Cir.1988) (per curiam) (holding that the district court did not abuse its discretion in declining to enhance an EAJA fee award to reflect "the skill of the attorneys").

*Id.*

Mr. Feinbloom must be accounted a lawyer steeped in the knowledge of immigration law and of exceptional skill. In this case, he persuaded the court of appeals to find the Government guilty of misconduct sufficient to work an estoppel – no mean feat. This court would happily reward his skillful representation with a fee award that reflected his usual and customary rate – or at least a rate more in line with rates charged by attorneys of even average competence in the New York City metropolitan area.

However, for the EAJA cap to have any meaning, "the special factors envisioned by the exception must be such as are not of broad and general application." *Pierce*, 487 U.S. at 573. Expertise in one's field of law – even if that field is somewhat esoteric, as immigration law is – is, apparently, not enough.[3]

In this regard, I reach the same conclusion as did my esteemed colleague Judge Wolford in the Western District of New York, who held, in a complex immigration case like this one, that *Healey* precluded an enhanced fee award and limited fees to the EAJA cap, with the appropriate cost of living increase applied. *Caplash v. Nielsen*, 294 F. Supp. 3d 123 (W.D.N.Y. 2018). It is noteworthy that Judge Wolford found, as I find, that the plaintiff in her case benefitted from the expertise provided by the unusually experienced immigration practitioner who represented her. But she nonetheless felt constrained by the EAJA cap and declined to award "special factor" fees because that expertise was not "essential" to the representation. I concur with her reasoning and see no way around applying it in this case.

Because I conclude that *Healey* is determinative of the issue presented, it is not necessary for the court to address the Government's other arguments about the ground on which the case was resolved at the appellate level or the types of legal fields that can qualify for enhanced EAJA fee awards.

Plaintiff shall present the court with a revised fee order, limited to the fees incurred in the district court, with the fees calculated per the cost-of-living enhancement table attached to Mr.

---

[3] Unless, of course, you are a patent lawyer, or one who speaks a foreign language—although the reference to patent lawyers in *Pierce* is plainly one that has outlived its usefulness, since the days are long past when patent lawyers were all engineers and scientists with law degrees.

Feinbloom's initial Declaration as Exhibit A. The court will direct the Clerk to enter judgment accordingly.

Dated: June 3, 2021

_____
U.S.D.J.

BY ECF TO ALL COUNSEL